STATE OF LOUISIANA

VERSUS

GRACE TROSCLAIR

**********

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 2017-CR-186
HONORABLE WARREN D. WILLETT, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John E. Conery, and Van H. Kyzar, Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

THIBODEAUX, Chief Judge, dissents in part and assigns reasons.

**J. Rodney Baum**
**Louisiana Appellate Project**
**830 Main Street**
**Baton Rouge, LA 70802**
**(225) 387-1142**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Grace Trosclair**

**Jimmy D. White**
**Assistant District Attorney**
**Thirty-Fifth Judicial District**
**P.O. Box 309**
**Colfax, LA 71417**
**(318) 627-2971**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**KYZAR, Judge.**

Defendant, Grace Trosclair, was charged by bill of information filed on February 22, 2017, with theft having a value of $750.00 or more but less than $1500.00, a violation of La.R.S. 14:67.[1] She was accused of taking prescription medications from the home of the victim, Judy Longino, without her consent on January 31, 2016.[2] Trial by a six person jury commenced on March 18, 2019, and Defendant was found guilty as charged on March 20, 2019. On October 10, 2019, Defendant was sentenced to serve five years at hard labor with all but ninety days suspended. Upon release, Defendant is to be placed on three years supervised probation. She was also ordered to pay a fine of $1500.00, costs of court, $750.00 to the Grant Parish Indigent Defender Board, and restitution to Judy Longino in the amount of $750.00. A "Notice of Intent to Appeal" was filed on October 18, 2019.

Defendant is now before this court asserting three assignments of error: 1) the evidence was insufficient to support the verdict; 2) trial counsel was ineffective; and 3) review of the record for errors patent.

## DISCUSSION

*Sufficiency of the Evidence*

In her first assignment of error, Defendant contends there was insufficient evidence to prove beyond a reasonable doubt that she committed a theft valued at more than $750.00 but less than $1500.00.

> When the issue of sufficiency of evidence is raised on appeal, the reviewing court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a

---

[1] Defendant was charged with violating the statute as was in effect between August 1, 2014 through July 31, 2017.

[2] The State orally amended the Bill of Information in open court on March 14, 2019 to reflect the offense occurring on this date as opposed to January 31, 2017 as written and thereafter amended the bill in writing on the morning of trial, to which no objection was offered, defense counsel stating that discovery responses reflected the corrected date.

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *State v. Ryan*, 07-504, p. 2 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268, 1270 (quoting *State v. Lambert*, 97-64, p. 5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).

However, the *Jackson* standard "does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt." *Mussall*, 523 So.2d at 1310. "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *State v. Allen*, 36,180, p. 5 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, 626, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).

*State v. Thomas*, 17-959, pp. 13-14 (La.App. 3 Cir. 9/26/18), 255 So.3d 1189, 1199, *writs denied*, 18-1757, 18-1662 (La. 4/22/19), 268 So.3d 294, 303.

Defendant was convicted of theft, defined in La.R.S. 14:67(A) as the "misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations." An intent to deprive the other permanently of whatever is the subject of the misappropriation or taking is required. *Id.* "To support the conviction[], the State had to prove (1) a taking (2) of a thing of value (3) that belongs to another, (4) with the intent to permanently deprive the other of the thing." *State v. Buteaux*, 17-877, p. 13 (La.App. 3 Cir. 3/14/18), 241 So.3d 1094, 1102, *writ denied*, 18-600 (La. 10/15/18), 253 So.3d 1309.

While Defendant primarily argues the insufficiency of the evidence to support the grade of the offense here, theft greater than $750.00 but less than $1,500.00,

2

challenging the State's proof of the value of the prescription medication allegedly taken, she argues generally and less specifically that the State failed to prove that she actually took any medications from the victim, Ms. Longino. As the conviction for theft, of whichever grade, actually hinges on this element of the offense, we address it first.

Judy Longino testified first for the State and indicated that she was retired and had worked at various adult and juvenile facilities as a correctional officer for many years. She stated that she had been diagnosed with "Spinal Spitz Tophus" with a herniated disc, had been wearing a back brace since 2012, and had been prescribed medications by her doctor. She was also diabetic and had a nerve condition for which she also took prescribed medications. She received help from Accessible Healthcare (Accessible), who sent a sitter to her home to assist her, beginning in 2013 or 2014. Defendant worked for Accessible and visited Ms. Longino's home as a company coordinator for Accessible in 2016 on approximately three occasions, including January 31, 2016. Amanda Bailey had been Ms. Longino's sitter and had been hired by Defendant for Accessible.

In January 2016, Ms. Longino's medications included hydrocodone, Valium, albuterol, "Asper," colchicine, Tanzeum, HCTZ, gabapentin, Spiriva, ProAir HFA, Ambien, "Beta lotions," and hydrochlorothiazide. Ms. Longino indicated that she had just received a three-month supply of her medications from Express Scripts, a mail order company, and Defendant and Bailey were at Ms. Longino's home when the medications arrived via UPS. Ms. Longino stated that she was given a prescription by her doctor for Valium and hydrocodone and that those prescriptions were filled by Ray's Pharmacy. She then testified that her Valium and all medications other than hydrocodone were delivered through Express Scripts. Ms. Longino testified that on January 31, Defendant informed her that she had to go

3

through all Ms. Longino's medications and that some had to be put into a safe "at the job" because it was dangerous for Ms. Longino to keep that much medicine in her home. Defendant then went through the medications and put a portion of them in a grocery bag. While looking through the medications, Defendant commented that her mother used several of the same medications Ms. Longino did, specifically the inhalers.

Ms. Longino testified that the medications were usually kept in her bedroom on her dresser. If she had any medications "left over before she got a shipment in, [she] would put them up front, and then the 90 day one would go all the way to the back side of the dresser." She organized the medications by how she took them during the day. Ms. Longino explained that Defendant took the "30 day supplies," poured some into "what I had left over in the other one," and put the bottles into a grocery bag, which she could not see through. Ms. Longino explained that Defendant left a one or two weeks' supply of her medications. She further testified that Defendant counted out the hydrocodone and told her it was too dangerous to have that much medication in her home at one time. Defendant left forty to forty-five of the hydrocodone of a supply of one hundred eighty and took the rest. Defendant subsequently left with the medications, saying she was taking them to the safe at Accessible's headquarters. Amanda Bailey, Ms. Longino's sitter, was in the bedroom when Defendant was taking the medications. Ms. Longino testified that Bailey "thought that that's what you were supposed to do with" the medications too. Ms. Longino never saw Bailey take any of the medications. She saw Defendant with the bag of medications in her hand when Defendant went out the door, and Defendant put the bag in her car. When asked if she gave Defendant permission to take the medication, Ms. Longino responded: "We had a piece of paper that she wrote down saying that she was taking the medication to the safe at the corporate office." The

4

paper was signed by Ms. Longino, Defendant, and Bailey. Defendant did not give her a copy of the paper. However, Ms. Longino testified that she did not consent to Defendant taking her medication and not returning it, only that it be stored for safekeeping.

After the incident on January 31, Defendant returned to Ms. Longino's home and was asked for the medications. Ms. Longino stated that Defendant then told her to "kiss her _ _ _."[3] Ms. Longino attempted to call Defendant numerous times after this, but Defendant never answered, and Defendant's voice mail would pick up each time.

Ms. Longino eventually called Accessible and asked for her medications. An Accessible employee responded that it did not have Ms. Longino's medications, and she was informed that Accessible "didn't do that, that that was a no." The call occurred approximately one week after the medications were taken from Ms. Longino's home. Ms. Longino subsequently called the Attorney General's Office (AG) and contacted the Grant Parish Sheriff's Office. Her medications were never recovered.

Defendant argues that there is insufficient evidence to prove beyond a reasonable doubt that she took the medications and that it is just as reasonable to believe that Amanda Baily or someone else took the medications as opposed to her. We disagree. Ms. Longino testified directly that she saw Defendant take a significant amount of her 90-day supply of most of her medicines and at least a two-week supply of hydrocodone from her house and saw her place them into a bag. Defendant then brought the bag out to Defendant's car. Ms. Longino testified that Defendant's excuse for taking the drugs was for safekeeping, only to be told by

---

[3] The actual words used by Defendant are left blank in the transcript.

5

Accessible employees and management that such actions were not authorized and that Accessible did not have her medication. Ms. Longino was adamant that Amanda Bailey did not take any medications from her, that Ms. Bailey was present watching when Defendant took the medications, and that it was not possible for her to have taken them because "she didn't touch my medications at all."

Amanda Bailey testified for the State as well. Bailey worked for Accessible assisting Ms. Longino and had been hired by Defendant to work for the company. Bailey met Defendant in a parking lot, and Defendant hired her on the spot. She met Ms. Longino the next day. She testified that she was present at Ms. Longino's home in January 2016 when Defendant was in Ms. Longino's bedroom going through medications. Defendant told Bailey and Ms. Longino that she was taking Ms. Longino's extra medications to the office and placing them in a safe and would bring the medicine back when Ms. Longino needed it. Bailey testified that she saw Defendant go through the medications, and she saw Defendant with medicine bottles in a grocery bag. Bailey also testified that the medications were originally thrown into a trash can that had a bag in it, and Defendant then took the medications out of the bag or lifted the bag out of the trash can. Defendant later asked Ms. Longino for another bag in which to put the medications. Bailey heard Defendant tell Ms. Longino she was taking the medications to the office to put in a safe, and she saw Defendant leave Ms. Longino's house with the medications. Bailey stated she had not much if any contact with Defendant after that day but that sometime later, Defendant asked Bailey to meet her. Bailey and Defendant met at 10 p.m. at Chevron, where Bailey worked from 4:00 a.m. until 2:00 p.m., for Bailey to sign paperwork. When they met, Bailey sat in Defendant's car and noticed bags similar to those Defendant left Longino's house with on the floor of the car. The bags appeared to contain medicine bottles.

6

Ms. Bailey stated that she realized that medication was not to be taken from a client's home when Ms. Longino called Accessible to obtain the rest of her medications. Bailey testified she had no part in taking Ms. Longino's medications.

During cross-examination, Bailey was shown exhibit D-1, which contained her signature. The document was dated January 31, 2016, and read:

> I have witnessed Grace Trosclair Manager & Care Coordinator help me to clean out my old expired medicine bottles. She did ask if I preferred to trash any extra or safe lock it for Emergencies only if necessary. I have decided not to choose safe lock option at this time. We will revisit safe lock option once we get to see my new wheelchair & make sure I can sit & secure Narcotic.
>
> I do understand that my DSW's are allowed to only remind me to take my medication. They should not do anything with my medication. If I need help I will call my Care Coordinator, or allow home health nurse to assist me if she is here.

Bailey testified that the handwriting looked like that of Defendant. The document was signed by Defendant, Ms. Longino, and Bailey. Bailey indicated she merely signed the document as a witness and that she was not certain the document was a purported receipt signed the day Defendant took Ms. Longino's medications.

Deputy Marshall Chris Pruitt, a former employee of the Pollock Police Department, testified that he assisted with the theft investigation and went to Ms. Longino's home on February 24, 2016, and met with Ms. Longino and Bailey. Ms. Longino reported to him that on January 31, 2016, she received a three-month supply of medications, that Defendant took two months' worth of the medications, and that she left Ms. Longino a one-month supply. Deputy Pruitt was told Defendant was supposed to place the medications in a safe at Accessible because she said it was dangerous to have that much medicine at home. Ms. Longino reported that she signed a receipt for the medications to be placed in a safe at Accessible, but she was not given a copy of said receipt. Ms. Longino advised the deputy that she witnessed Defendant place the medicine in a bag and leave the residence.

7

Deputy Pruitt testified that he questioned Amanda Bailey, who reported she saw Defendant put Ms. Longino's medication in her car. She advised him that Defendant Trosclair told her it was Accessible's policy not to leave medications at a client's home and that it was to be stored in a safe at the home office. Deputy Pruitt never received any information that Bailey took the medication. He further testified that he spoke to a supervisor at Accessible and was informed that Accessible did not take client's medications and that "at no point in time should this have ever occurred, and we need a police report because that medication is stolen." To Deputy Pruitt's knowledge, Defendant was not found in possession of any of Ms. Longino's medications.

Esther Perera also testified and indicated that she had been the director of Accessible since 2007. The company provided nonmedical personal care services and homecare for the elderly and disabled, including Ms. Longino, who became a client of Accessible in April 2015 and used their long-term, personal care services. The Accessible program Ms. Longino participated in did not include medication management, as it was prohibited by state regulations. Thus, employees were not allowed to touch Ms. Longino's medication. Perera assumed Defendant, employed by Accessible, was aware of that limitation. Bailey, on the other hand, was not aware of the prohibition. Bailey reported that Defendant told her that Ms. Longino was not allowed to have a ninety-day supply of medication in her home, that the excess medications were to be removed, and that Ms. Longino would be given a thirty-day supply each time she ran out of medication.

Defendant's final position with the company was working as a billing assistant. She sometimes interacted with clients outside the office assisting with Medicaid issues, but that contact was limited. Ms. Bailey, however, was employed by Accessible as a Direct Service Worker (DSW), a person that went into homes and

8

performed services for clients. Defendant directly hired Bailey to work for Ms. Longino, and Perera testified she had never heard of Bailey until she saw her name on payroll sheets. Bailey's hiring raised concerns because, as Perara stated, "You're supposed to train them, you're supposed to do background checks, you're supposed to do reference checks, and so you cannot just take a person off the street, and send them over to somebody elderly."

Perera testified that she had no idea about the issue involving Ms. Longino and the missing medications until Ms. Longino called Accessible. Ms. Longino spoke to the office manager by phone and asked for her medications, which the company did not have. Accessible reported the matter to police but was told Ms. Longino would have to do so herself. Perera testified that it was Ms. Longino's decision to report the matter to Pollock police. Defendant was subsequently placed on administrative leave from Accessible because she did not show up for a mandatory meeting. Thereafter, Defendant could not be reached by phone and was eventually terminated for abandonment.

Perera further testified that Defendant had a good reputation at the company until a "certain point." The company received complaints about erratic behavior from four of Defendant's administrative co-workers and three clients. Accessible thought Defendant might be using recreational drugs and showed Perera a copy of the "jail paper" indicating Defendant had been arrested. A DSW reported to Perera that she saw Defendant purchase and use meth. Additionally, Defendant had been arrested in Grant Parish more than once for possession of narcotics in incidents unrelated to Ms. Longino's medication.

After Defendant was terminated, a woman with the State Waiver Office, which supervised cases of individuals with Medicaid waivers, called Perera and informed her that a former employee of Accessible had gone to a competitor looking

9

for a job. The employee had one of Accessible's clients with her and had a binder with all of Accessible's client information, including care plans and contact information. Perera filed a complaint against Defendant in Rapides Parish in late February of 2016, though those charges were eventually dropped.

At trial in this matter, it was revealed that Defendant had lodged a complaint with the Attorney General's Office against Accessible in early 2016. Perera testified that she did not report the theft of records in retaliation for the report to the AG and that she did not know about the complaint made to the AG until May or July of 2016. Perera was also contacted by the Medicaid Fraud Unit in May 2016. The person Perera spoke to said Defendant had sent 300 emails between 1:00 and 3:00 a.m. wherein she alleged Accessible had committed fraud.

Lieutenant Caleb Martin of the Pineville Police Department also testified on behalf of the State. He investigated a complaint made by Accessible on February 24, 2016, regarding theft of business records and a cell phone. Lieutenant Martin contacted Defendant on March 1, 2016, and she told him she had returned the documents. Lieutenant Martin called Dave Marshall, the manager at Accessible, and Marshall informed him that the documents had been returned. Thus, Marshall did not want to pursue charges. Lieutenant Martin also contacted Perera, who stated that if everything had been returned, she would decline to pursue charges. Perera then contacted Lieutenant Martin three days later and alleged Defendant had not in fact returned all of the missing documents. A search warrant was subsequently executed at Defendant's residence, and Defendant turned over confidential patient documents and original time sheets still in her possession. Defendant was arrested at the time, although the charges were later dropped.

Lieutenant Martin also testified that he was contacted by the AG regarding complaints lodged by Defendant against Accessible. An employee of the AG

10

reported that Defendant said she had a hard drive containing incriminating information. Defendant gave the hard drive to Lieutenant Martin, and he turned it over to the AG. He stated that it was obvious to him that Defendant and Accessible "had issues."

After the State rested, Defendant testified on her own behalf. She denied taking the medications from Ms. Longino. During the course of her testimony, she admitted that in the past she had been an alcoholic and then turned to crack cocaine, for which she was arrested on March 2, 2007. She participated in drug court in both St. Mary and Iberia Parishes and also went to rehab for eight months. She graduated from drug court in 2009. Defendant testified that she later relapsed on Father's Day 2011.

Defendant then admitted to being convicted in late 2017 for a felony methamphetamine possession for which she was arrested in November 2015. She minimized her involvement in the offense, stating that she went to the casino to rescue an acquaintance/friend from an abusive relationship and the friend and another man put methamphetamines in her purse and in her car. She stated that she pled guilty to the offense because her lawyer told her she would be found guilty by a jury and further that "I really didn't have time to um, dedicate to the investigation necessary."

Defendant admitted she was at Ms. Longino's home on January 31, 2016. Defendant claimed she went to Ms. Longino's home because Meals on Wheels informed her that Ms. Longino was found on the floor. Defendant also stated she went to Ms. Longino's home to complete Accessible's paperwork, which had not been done by Ms. Longino's last supervisor. Bailey was also at the home that day with Ms. Longino. Defendant testified that Ms. Longino asked for help with her medications because her last worker "messed up all her medication organization."

11

Defendant, Ms. Longino, and Bailey went into Ms. Longino's room, and Ms. Longino purportedly showed Defendant where her medications were and asked Defendant to help her organize the medications. Defendant stated that Ms. Longino had expired medications and was "just really confused." Thus, they threw away empty medicine bottles and Defendant stated, "extras were put in order in the back of extras." She then stated it was not Accessible policy to take medications out of the home and that, as a compliance manager, she knew the rules very well. Defendant explained that a safe lock, as noted in an exhibit shown to her, referred to a box with a code that Ms. Longino could keep at home to prevent her medications from being stolen. Defendant denied telling Ms. Longino that she was going to take her medications to the main office. Defendant again denied removing any medications from Ms. Longino's home and leaving with a bag full of medications.

Defendant stated that Bailey placed a trash can in front of Ms. Longino's wheelchair and that Ms. Longino was instructed to put the expired medications in the trash. She testified that Ms. Longino threw the expired medications in the trash, and Bailey did not touch or handle them. Defendant maintained that only empty medicine bottles were thrown into the trash. When asked if Bailey took Ms. Longino's medications, Defendant responded: "She may have." Defendant then indicated that she did not steal them.

When asked about Bailey's and Ms. Longino's testimonies, Defendant stated that she believed Bailey "pretty much stated up here what she witnessed." "[T]he only person that might have been a bit confused was Ms. Longino." She then said she believed Accessible possibly confused Ms. Longino and told her "these things . . . and did whatever - - they're very good at - - at what they do[.]" When asked about meeting Bailey at Chevron and the bags of pills Bailey saw in her car, Defendant

12

stated, "I don't think she saw me um, putting medication - - I - - I think she maybe [sic] confused about that part."

Defendant was asked if she thought Accessible was paying Bailey and Ms. Longino to lie about her. She testified that she believed it to be possible. She further indicated she had been warned and threatened by Accessible in 2017 "not to ever speak their name[.]"

Defendant admitted reporting Accessible to the Fraud and Control Unit of the Department of Health and Hospitals, stating it was because of nineteen complaints by clients about not receiving services. She stated that she was arrested for the instant offense around the same time. Defendant further asserted that she had found a woman that had been without care for nine months. That was the day she was told to back off, and she was stepping on the supervisor's toes. However, Defendant adamantly denied setting off an investigation by the AG. She denied being the first person to report Accessible, and she also denied stealing office files.

Theresa Trosclair, Defendant's mother, testified on her behalf. She admitted that she knew that Defendant had been arrested more than ten years ago and participated in drug court in St. Mary Parish. She also stated that Defendant went to rehab for drug addiction. Ms. Trosclair lived with Defendant for two years, including during January 2016, and babysat Defendant's children while Defendant worked. She testified that Defendant did not use drugs during the time she worked for Accessible and never came home under the influence. Ms. Trosclair did not recall Defendant bringing home any medication, and Ms. Trosclair did not use any type of inhaler, albuterol, or asthma medication. Ms. Trosclair testified she was aware that Defendant had been arrested for felony possession of methamphetamine

13

and later pled guilty.[4] Ms. Trosclair said Defendant was being harassed by her employer around the same time she was arrested for drug possession.

After considering all the evidence, we find it sufficient for the jury to have concluded beyond a reasonable doubt that Defendant took the medications from Ms. Longino without her consent, with the intent to permanently deprive her of the items. Obviously, the jury was faced with conflicting testimony in that Ms. Longino and Amanda Bailey reported that Defendant in fact took the medications, while the Defendant denied the taking. The jury chose to accept the testimony of Ms. Longino and Bailey and rejected Defendant's version and explanations of the events. It is not for this court to second guess the jury's credibility determinations, as the jury is in the best position to make such decisions, given their opportunity to see, hear, and observe the unique characteristics of the witnesses while testifying.

> When there is conflicting testimony as to factual matters, the resolution of which depends on witness credibility, a matter of weight of evidence rather than its sufficiency is presented. *Tibbs v. Florida*, 457 U.S. 31, 46, 102 S.Ct. 2211, 2220-21, 72 L.Ed.2d 652 (1982) ("This resolution of conflicting testimony in a manner contrary to the jury's verdict is a hallmark of review based on evidentiary weight, not evidentiary sufficiency."). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Higgins*, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226[, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005)]. Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369.

*State v. Reed*, 14-1980, pp. 26-27 (La. 9/7/16), 200 So.3d 291, 312, *cert. denied*, 137 S.Ct. 787 (2017).

Accordingly, we find sufficient evidence, when viewed in the light most favorable to the prosecution, supporting proof beyond a reasonable doubt of the

---

[4]While not completely clear, Trosclair's testimony appears to be referring to the November 2015 incident at the casino admitted to by Defendant during her testimony.

element of the offense of theft that there was a taking and that Defendant was the person that committed the act.

Defendant next argues that the State presented insufficient evidence to support the verdict of theft of property valued at greater than $750.00, but less than $1,500.00. Defendant argues that at best, the evidence supports only a verdict of misdemeanor theft. Defendant contends the evidence regarding the amount of medications taken and the value of the medications was conclusory and not supported by the evidence. Specifically, Defendant asserts that the victim, Ms. Longino, only testified that she expended $680.00 to replace medicines and that any other evidence of the value of the medicines taken was unclear or based on valuations at the time of trial as opposed to at the time of the theft. We disagree.

"The state must prove the value of the stolen property, for upon this proof depends the determination of the severity of the theft, and the punishment for a convicted offender." *State v. Bolton*, 99-80, p. 5 (La.App. 5 Cir. 6/30/99), 739 So.2d 364, 366 (citations omitted). Louisiana Revised Statutes 14:2(2) addresses anything of value as follows:

> "Anything of value" must be given the broadest possible construction, including any conceivable thing of the slightest value, movable or immovable, corporeal or incorporeal, public or private, and including transportation, telephone and telegraph services, or any other service available for hire. It must be construed in the broad popular sense of the phrase, not necessarily as synonymous with the traditional legal term "property." In all cases involving shoplifting the term "value" is the actual retail price of the property at the time of the offense.

"Because value is an essential element of the crime charged, the state must present evidence of the value of the stolen property at the time of the theft." *State v. Smith*, 94-901, p. 7 (La.App. 5 Cir. 8/28/96), 680 So.2d 95, 98; *see also State v. LeBlanc*, 10-1484 (La.App. 4 Cir. 9/30/11), 76 So.3d 572, *writ denied*, 11-2300 (La. 11/18/11), 75 So.3d 446. The trier of fact is to consider the value that the stolen

15

items have to the victim. *See State v. Harris*, 97-778 (La. 3/4/98) 708 So.2d 387.

The testimony of the property's owner is sufficient to establish that property's value

when it is taken in a theft. *State v. Fontenot*, 16-226 (La.App. 3 Cir. 11/2/16), 207

So.3d 589. "Unless it is shown the owner lacks knowledge of the value of a movable,

his testimony as to value is generally admissible, with its *weight* being left to the

jury." *State v. Carthan*, 99-512 (La.App. 3 Cir. 12/8/99), 765 So.2d 357, 362, *writ*

*denied*, 00-359 (La.1/12/01), 778 So.2d 547 (quoting *State v. Stack*, 97-1176, p. 7

(La.App. 5 Cir. 4/15/98), 710 So.2d 841, 844).

Ms. Longino was questioned regarding her replacement of the medications as

follows:

> Q    . . . you did replace some of them for the 90 day supply, can you tell me about that uh, what do you recall?  Did you have to pay for them out of your own pocket?
>
> A    Yes, sir.
>
> Q    And tell me about that - - what - -
>
> A    I had to replace some of the inhalers which I got a discount on them, Medicare agreed to help pay a portion of it, . . .
>
> Q    Okay.
>
> A    . . . but they said I had to wait until she was arrested, and have a trial date before they can pay the whole amount . . .
>
> Q    Okay.
>
> A    . . . on it.  And I had to replace my needles for my insulin.
>
> Q    Did you - - did you replace any of your Valium or Hydrocodone?
>
> A    Yes, sir.
>
> Q    Okay, and did you pay for that yourself?
>
> A    Yes, sir.
>
> Q    Uh, do you recall, in terms of medications, did you - - did you replace it all completely yourself or did you - -

A      Not all of it because I didn't have enough money, and I couldn't borrow that much money. I had to go to the finance company, and borrow the money to replace it.

Q      Okay, and how much did you personally spend out of your pocket to replace the portion of the 90 day supply that you didn't have?

A      Around six hundred eighty dollars ($680.00).

Q      Okay. Um, I'm assuming they wouldn't resupply you with the - - the different drugs that they had sent the 90 day supply - -

A      That's correct.

Ms. Longino indicated that Medicare generally helped with the cost of her medications and that it did pay a portion of the medications that she ultimately had to replace, though only after charges were filed against Defendant. As the threshold here was $750.00 for the grade of theft at issue from the verdict, the inference from this evidence alone is that the medicines taken totaled at least this amount. It is clear from Ms. Longino's testimony that she was unable to replace all her medications with the $680.00 that she was forced to borrow and that she could not afford to borrow more money in order to replace the rest. Further, there was extensive evidentiary support for the valuation of the theft far exceeding $750.00.

Pharmacist Daniel Reitzell, who was accepted as an expert, testified about the value of Ms. Longino's medications. He was asked to estimate the value of the medications taken by Ms. Longino at the time of trial and the time of the theft. Though he did not give the numerical values of each of Ms. Longino's medications at the time of the theft, those that he did give more than support the jury's determination of the grade of the offense here.

As to the price of the drug Colchicine, of which Ms. Longino was missing an approximate 60-day supply, Mr. Reitzell testified that it had a present value of $763.00 per 90-day supply. He further noted that the value of the drug has actually gone down from 2016, as it now has a generic version available on the market. Thus,

17

based on this testimony, the loss of a 60-day supply in 2016 would be worth approximately $500.00. As to the drug Tanzeum, Mr. Reitzell testified that it had a present value of $1,884.00 for a 90-day supply. He testified that the price of Tanzeum is roughly the same as it was in 2016 as it currently is no longer on the market. Thus, a 60-day supply would have had a value of at least $1,200.00. He testified that the drug Spiriva had a present-day value of $1,551.00 for a 90-day supply and that the price had not changed significantly since 2016. Thus, the value of the 60-day supply taken would be at least $1,000.00, or at the very least, over $750.00. Mr. Reitzell's testimony also included the present-day value of other drugs prescribed to Ms. Longino for which he gave no 2016 valuation but merely stated that the prices had not fluctuated much. The total valuation of these other drugs alone met the threshold collectively for a 60-day supply taken. Finally, when asked if the overall value of the drugs allegedly taken would be less than $750.00, Mr. Reitzell definitively replied "No sir."

The jury clearly accepted the testimony of Ms. Longino and Mr. Reitzell in concluding that the value of the medications taken from Ms. Longino's home exceeded $750.00. It is not for this court to re-weigh that testimony. *See Reed*, 200 So.3d 291. Accordingly, we find that the evidence was sufficient, when viewed in the light most favorable to the prosecution, to have found the elements of theft greater than $750.00 but less than $1,500.00 were met.

*Ineffective Assistance of Counsel*

In her second assignment of error, Defendant contends she was denied her right to due process as a result of ineffective assistance of counsel. Specifically, Defendant asserts defense counsel failed during the voir dire process to challenge for cause potential juror Bonita Pruitt, an assistant district attorney in Grant Parish, as well as Officer Credeur, a law enforcement officer employed by the agency that

18

conducted the investigation in this case and which had co-officers "testifying for the prosecution in this case." This occurred, Defendant contends, despite the court and the State specifically bringing the issues to defense counsel's attention. Defendant asserts that "Mr. Credure [sic], the officer, was in fact on the jury."

Defendant also alleges defense counsel was ineffective for refusing to subpoena documents requested by her and to call witnesses she requested. In particular, she claims defense counsel refused to obtain and use Defendant's pharmacy records to demonstrate she and her family did not need the medications she was accused of stealing. Additionally, Defendant contends that defense counsel refused to subpoena records to verify the amount, type, and cost of medication actually being used by Ms. Longino. Defendant urges defense counsel further refused to subpoena documents from UPS or other mail carriers to confirm the delivery of medication to Ms. Longino, including the dates of delivery. Defendant argues defense counsel's representation substantially prejudiced her.

We note here that the State alleges Bonita Pruitt was never called as a potential juror or questioned by attorneys, and the record supports this fact. As for Officer Mark Credeur, the State notes that pursuant to La.Code Crim.P. art. 783(C), no person or group of persons can automatically be excused from jury service. The State also points out that defense counsel consulted with Defendant and made a calculated trial strategy decision to keep Credeur on the jury. The State argues that the decisions regarding failure to subpoena prescription records and price lists were discussed during trial conferences and were strategic decisions by defense counsel given the State's burden of proof as to the issues. Indeed, in closing argument, counsel for Defendant stated to the jury that he did not obtain and/or use Ms. Longino's pharmacy and delivery records because the State had the burden of proving its case against Defendant. Nevertheless, we recognize the prevailing view

19

that issues of ineffective assistance of counsel are best suited for review in post-conviction relief proceedings where a record can be made and considered.

> The issue of ineffective counsel is more appropriately addressed in an application for post-conviction relief, where an evidentiary hearing can be conducted in the trial court. *State in the Interest of A.B.*, 09-870 (La.App. 3 Cir. 12/9/09), 25 So.3d 1012. However, where an ineffective assistance claim is raised on appeal, this court may address the merits of the claim if the record discloses sufficient evidence to rule on it. *Id.*
>
> When this court considers a claim of ineffective counsel on appeal, the defendant must satisfy a two-part test. He must first show counsel's performance was deficient and next, that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, 104 S.Ct. 2052.

*State v. Cochran*, 19-226, pp. 18-19 (La.App. 3 Cir. 12/18/19), 286 So.3d 1191, 1204 (alteration in original).

The record does appear to show that defense counsel consulted Defendant about challenging Credeur's placement on the jury and that the two of them made the decision not to do so. However, we note that this issue cannot be completely reviewed on appeal because the entirety of jury selection has not been transcribed and included in the record herein. Moreover, this court has stated that a decision to accept a juror is a trial strategy decision that should be relegated to post-conviction relief. *State v. Thibeaux*, 17-293 (La.App. 3 Cir. 10/11/17), 229 So.3d 967, *writs denied*, 17-1914, 17-1909 (La. 2/25/19), 266 So.3d 287, 288.

Accordingly, we find Defendant's claim of ineffective assistance of counsel more suitable to a possible post-conviction relief application and thus, decline to address the issue here.

*Errors Patent Review and Assignment of Error Three*

In the third assignment of error, Defendant asks for an error patent review, which is routinely done in accordance with La.Code Crim.P. art. 920. After reviewing the record, we find there are two errors patent, neither of which require reversal of the conviction or sentence.

First, the bill of information erroneously cites La.R.S. 14:67(B)(1) as statutory authority for Defendant's charge of theft. However, subsection (B)(1) is the penalty provision that applies when the taking amounts to a value of $25,000.00 or more. The value alleged in the bill was more than $750.00 but less than $1500.00, which falls under a different penalty provision than the one cited. Louisiana Code of Criminal Procedure Article 464 provides:

> The indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

Defendant does not allege any prejudice because of the error, and we find none. Thus, any error in regard to the reference to the subsection of the theft statute is harmless. *State v. Allen*, 09-1281 (La.App. 3 Cir. 5/5/10), 36 So.3d 1091.

Next, we find that the trial court erred in failing to specify a payment plan for two of the payments ordered as conditions of probation. Defendant was sentenced to five years at hard labor with all but the first ninety days suspended. Defendant was placed on supervised probation for three years subject to the general conditions of La.Code Crim.P. art. 895. Additionally, as conditions of probation, Defendant was ordered to pay restitution of $750.00 to the victim, Ms. Longino, at the rate of $250.00 per month to be paid in full by June 20, 2020, and to pay a fine of $1500.00

21

plus court costs. She was also ordered to pay $750.00 to the Public Defender's Office.

A payment plan for the fine, court costs, and payment to the Public Defender's Office was not established. In *State v. Arisme*, 13-269, pp. 3-4 (La.App. 3 Cir. 10/9/13), 123 So.3d 1259, 1262, this issue was addressed by this court:

> First, as a condition of probation, the trial court ordered a $250.00 fee to the Louisiana Crime Lab, for which a payment plan was not established. In *State v. Wagner*, 07-127, pp. 7-8 (La.App. 3 Cir. 11/5/08), 996 So.2d 1203, 1208, this court held in pertinent part:
>
>> When the fines and costs are imposed as a condition of probation, but the trial court is silent as to the mode of payment or the trial court attempts to establish a payment plan, this court has required a specific payment plan be established. *See State v. Theriot*, 04-897 (La.App. 3 Cir. 2/9/05), 893 So.2d 1016 (fine, court costs, and cost of prosecution); *State v. Fuslier*, 07-572 (La.App. 3 Cir. 10/31/07), 970 So.2d 83 (fine and costs); *State v. Console*, 07-1422 (La.App. 3 Cir. 4/30/08), 981 So.2d 875 (fine and court costs).
>>
>> We view this procedure as no different from payment plans for *restitution*. *See State v. Dean*, 99-475 (La.App. 3 Cir. 11/3/99), 748 So.2d 57, *writ denied*, 99-3413 (La.5/26/00), 762 So.2d 1101 (restitution only), *State v. Reynolds*, 99-1847 (La.App. 3 Cir. 6/7/00), 772 So.2d 128 (restitution, fine, and costs), *State v. Stevens*, 06-818 (La.App. 3 Cir. 1/31/07), 949 So.2d 597 (restitution, fine, court costs, and reimbursement to Indigent Defender Board), and *State v. Fontenot*, 01-540 (La.App. 3 Cir. 11/7/01), 799 So.2d 1255 (restitution, court costs and payments to victim's fund, Indigent Defender Board, and District Attorney).
>>
>> We, therefore, remand this case to the trial court for establishment of a payment plan for the fine, noting that the plan may either be determined by the trial court or by Probation and Parole, with approval by the trial court. *See Stevens*, 949 So.2d 597.
>>
>> Similarly, the trial court's ordering the payment to the crime lab fund during the period of probation is an insufficient payment plan. We also remand the case to the trial court for establishment of a payment plan for these costs, noting that the plan may either be determined by the

22

trial court or by Probation and Parole, with approval by the trial court. *See Stevens*, 949 So.2d 597.

This issue has been similarly resolved in other cases. *See State v. LaCombe*, 09-544 (La.App. 3 Cir. 12/9/09), 25 So.3d 1002, and *State v. Snelling*, 09-1313 (La.App. 3 Cir. 5/5/10), 36 So.3d 1060, *writ denied*, 10-1301 (La.12/17/10), 51 So.3d 16. Accordingly, we remand this case to the trial court for the establishment of a payment plan for the fee, noting that the plan may either be determined by the trial court or by the Department of Probation and Parole with approval by the trial court. *See Stevens*, 949 So.2d 597.

Accordingly, while we affirm the conviction and sentence, we remand to the trial court for the establishment of a payment plan for the fine, court costs, and payment to the Public Defender's Office imposed as conditions of probation. The payment plan may either be determined by the trial court or by the Office of Probation and Parole with approval by the trial court.

## CONCLUSION

For the foregoing reasons, Defendant's conviction and sentence are affirmed. Defendant's claim that defense counsel was ineffective is relegated to post-conviction relief. The case is remanded to the trial court for the establishment of a payment plan for the fine, court costs, and payment to the Public Defender's Office imposed as conditions of probation. The payment plan may either be determined by the trial court or by the Office of Probation and Parole with approval by the trial court.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

23

STATE OF LOUISIANA

VERSUS

GRACE TROSCLAIR

**THIBODEAUX, Chief Judge, dissenting in part.**

I disagree with the majority's conclusion that theft of more than $750 but less than $1,500 was proven.

The victim, Judy Longino, testified that she paid $680 to replace the stolen medication. While the pharmacist did place the value of the medicine at approximately $7,000, he did not address the Medicare discount. He only testified regarding the retail value of the medications. If the proper value of the medications were based on the price of the medications after the Medicare discount, the evidence would not support a conviction of theft of more than $750. The theft was from Ms. Longino. Ms. Longino was deprived of $680 because of the defendant's conduct. The defendant should be convicted of stealing that amount. I would vacate the defendant's sentence and enter a judgment of guilty of theft having a value of less than $750, and I would remand for resentencing under La.R.S. 14:67 in effect at the time the offense was committed.

For the foregoing reasons, I respectfully dissent in part.